Steve Vartazarian, Esq. (SBN 227635)
Matthew J. Whibley, Esq. (SBN 299383)
**THE VARTAZARIAN LAW FIRM, APC**
23621 Park Sorrento, Suite 101
Calabasas, CA 91302
P: (818) 990-9949
F: (818) 990-6124
E: mail@thevlf.com

**Attorneys for Plaintiffs,**
PATRICIA LAUCELLA,
NATALIA JOVOVICH; and
NICOLE ROSE LOMIS

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

PATRICIA LAUCELLA, NATALIA JOVOVICH; and NICOLE ROSE LOMIS

Plaintiffs,

v.

MEDTRONIC, INC.; DOES 1-100, Inclusive,

Defendants.

Case No. 2:25−cv−00466−SB−PVC

Judge: Hon. Stanley Blumenfeld, Jr.

**SECOND AMENDED COMPLAINT FOR DAMAGES**

1. NEGLIGENCE
2. STRICT PRODUCTS LIABILITY – FAILURE TO WARN
3. STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT
4. WRONGFUL DEATH
5. LOSS OF CONSORTIUM

**DEMAND FOR JURY TRIAL**

PATRICIA LAUCELLA, NATALIA JOVOVICH; and NICOLE ROSE LOMIS, allege as follows:

## I. INTRODUCTION

1. This products liability action arises out of the wrongful death of Hollywood executive Mr. Erik Lomis ("Decedent"), who depended on a Medtronic Evera™ XT DR DDBB1D4 Implantable Cardioverter Defibrillator ("ICD") to prevent sudden cardiac death. ICDs are designed to monitor heart rhythms and deliver life-

saving shocks during arrhythmias.

2. Decedent's ICD catastrophically failed on March 22, 2023, when he experienced an arrhythmia episode. Instead of delivering the programmed 35-joule shock, the ICD delivered only a fraction of that energy (i.e. a 5.2-joule shock), and then no effective shocks (i.e. a series of zero-joule shocks) thereafter, causing Decedent's death.
3. The subject ICD was adulterated in violation of FDA regulations and requirements related to the Device.
4. Plaintiffs (Decedent's wife and daughters) bring claims under California law, based on duties parallel to federal standards, seeking damages for negligence, strict products liability (failure to warn and manufacturing defect), wrongful death, and loss of consortium.

## II. <u>PARTIES</u>

5. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.
6. At all relevant times, Plaintiff PATRICIA LAUCELLA, now widowed, was Decedent's lawful spouse. Plaintiffs NATALIA JOVOVICH and NICOLE ROSE LOMIS are Decedent's daughters.
7. At all relevant times, Plaintiffs resided and financially depended on Decedent.
8. At all relevant times, all Plaintiffs have been residents of Los Angeles County.
9. Decedent ERIK LOMIS was a resident of Los Angeles County until his death on March 22, 2023.
10. Defendant MEDTRONIC, INC. is a Minnesota corporation, engaged in designing, manufacturing, marketing, and selling medical devices, including the subject ICD implanted in Decedent.
11. Plaintiffs are unaware of the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and therefore sue these Defendants by fictitious names. Plaintiffs will amend this Complaint to allege their true names and

capacities when ascertained. Each DOE Defendant was, at all relevant times, responsible in some manner for the manufacture, design, testing, distribution, sale, creation, and/or supply of the defective ICD at issue, and is responsible in some manner for the occurrences herein alleged.

12. Plaintiffs are informed and believe, and thereon allege, that at all relevant times, DOES 1 through 100, were employees, agents, partners, joint venturers, alter egos, servants, and/or joint tortfeasors of the named Defendants, and were acting in the course and scope of such relationships with the permission, consent, and ratification of the other Defendants. Each Defendant, including each DOE Defendant, is jointly and severally liable for the harm alleged.

13. At all relevant times, each Defendant acted as the agent or alter ego of every other Defendant. Defendants had a joint enterprise and are jointly and severally liable for the tortious acts and omissions alleged.

14. Defendants are responsible for the research, development, design, engineering, formulation, testing, inspection, production, fabrication, assembly, creation, construction, compounding, packaging, labeling, advertising, promotion, marketing, distribution, supplying, leasing, franchising, retailing, wholesaling, manufacturing, warranting, servicing, repairing, installation, instruction, training, and sale of the subject ICD, including all DOES 1-100 who were at all relevant times engaged in, contributed to, or had control over such activities.

15. The term "Defendants" as used herein includes all individuals, corporations, entities, and organizations, named or unnamed, who participated in any way in the manufacturing, research, development, design, engineering, formulation, testing, inspection, production, fabrication, assembly, creation, construction, compounding, packaging, labeling, advertising, promotion, marketing, distribution, supplying, leasing, franchising, retailing, wholesaling, warranting, servicing, repairing, installation, instruction, training, and sale of the subject ICD, including all DOES 1-100 who were at all relevant times engaged in, contributed

to, or had control over such activities.

## III. JURISDICTION AND VENUE

16. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18. Plaintiffs PATRICIA LAUCELLA, NATALIA JOVOVICH, and NICOLE ROSE LOMIS are citizens and residents of the State of California, residing in Los Angeles County.

19. Defendant MEDTRONIC, INC. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in Minnesota, and is thus a citizen of Minnesota for purposes of diversity jurisdiction.

20. Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District. Specifically, Decedent ERIK LOMIS resided in Los Angeles County at the time of the subject incident, the allegedly defective device was installed, used and failed in this District, and Plaintiffs' injuries were suffered here. Additionally, Defendant MEDTRONIC, INC. conducts business within this District.

## IV. FACTUAL BACKGROUND

### *A. History of the Evera ICD*

21. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.

22. The Evera™ XT DR DDBB1D4 ICD is a Class III medical device that received Premarket Approval from the FDA. Under the PMA process, Defendants had to provide detailed device specifications—covering battery longevity such that the device itself through interrogation would provide the patient and its doctors with

ample notifications regarding the longevity remaining on the device, maximum delivered joules (up to ~36 J or more), capacitor charge times, and internal structural integrity (e.g., feedthrough welds, lead header, insulation).

23. As part of the PMA application and approval process, Defendants specifically represented—and were required by the FDA to ensure—that the Device's feedthrough welds, battery welds, and internal components are sealed and free of cracks, delamination, or separation, and that the ICD would provide timely and adequate alerts to users and physicians if the battery or circuitry began to fail. These PMA conditions obligated Defendants to maintain the weld integrity, prevent internal delamination, validate battery capacity, and ensure that interrogations would detect and warn of any battery or high-voltage circuit failure.

24. In addition to meeting the specific PMA-approved device specifications, Defendants are required by law to comply with 21 CFR Part 820 — Current Good Manufacturing Practices (CGMPs) for medical devices. These regulations impose "methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices" so that each device remains safe and effective. See 21 CFR § 820.1(a). Among the relevant CGMP requirements are the below regulations and requirements.

25. 21 CFR § 820.70 (Production and Process Controls): Defendants must "develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications." 21 CFR § 820.70(a). These provisions also require, among other things:

- "Documented instructions, standard operating procedures (SOPs), and methods that define and control the manner of production" (§ 820.70(a)(1));
- "Monitoring and control of process parameters and component and device characteristics during production" (§ 820.70(a)(2)); and
- "Criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples."

(§ 820.70(a)(5)).

26. As applied here, these regulations mandate robust procedures to ensure each ICD is built and tested consistently, so the final product matches the FDA-approved design and does not deviate from required specifications.

27. 21 CFR § 820.75 (Process Validation): Where manufacturing steps cannot be fully verified by final inspection alone, the manufacturer must ensure "the process shall be validated with a high degree of assurance and approved according to established procedures." (§ 820.75(a)). Validation activities must be documented to demonstrate that the process consistently produces a device meeting its predetermined specifications, and "when changes or process deviations occur," the manufacturer must "review and evaluate the process and perform revalidation where appropriate." (§ 820.75(c)).

28. Applied to ICDs, this includes validating critical processes such as battery welding, lead insulation, feedthrough attachments, and any other step where a hidden defect could prevent the final product from conforming to the FDA-approved specifications.

29. 21 CFR § 820.80 (Acceptance Activities). Under § 820.80, Defendants are required to "establish and maintain procedures for acceptance activities," including inspections, tests, or other verification methods. Before shipping any finished device, the manufacturer must confirm it "meets acceptance criteria" and "shall not be released for distribution until . . . the release is authorized by the signature of a designated individual(s)." (§ 820.80(d)(1)–(4)).

30. This entails conducting thorough inspections and testing to confirm that each ICD meets all required specifications, including proper shock-energy output, battery performance, and structural integrity before being distributed to patients.

31. 21 CFR § 820.100 (Corrective and Preventive Action "Each manufacturer shall establish and maintain procedures for implementing corrective and preventive action," including the requirement to "investigate the cause of nonconformities

relating to product, processes, and the quality system" and "identify the action(s) needed to correct a*nd prevent recurrence of nonconforming product and other quality problems."* (§ 820.100(a)(2)–(3)). When nonconforming devices or processes are discovered, the manufacturer must take action to ensure such problems are corrected and do not recur.

32. This regulation obligates Defendants to identify, remediate, and prevent unsafe or defective devices from reaching patients by promptly addressing any discovered nonconformities in manufacturing.

33. 21 U.S.C. § 351 (adulterated devices) dictates that a Class III device like the Evera™ XT DR DDBB1D4 ICD is deemed adulterated if:

- "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation" do not comply with current good manufacturing practice (CGMP) or the "applicable requirements" enforced by the FDA. 21 U.S.C. § 351(h); 21 U.S.C. § 351(h); 21 U.S.C.§ 351(h);
- or if it is a Class III device required to have an approved application for premarket approval (PMA), but fails to adhere to the standards or conditions of that approval. 21 U.S.C.§ 351(f); 21 U.S.C. § 351 (f); 21 U.S.C.§ 351(f).

34. Specifically, 21 U.S.C. § 351(h) provides that a device is adulterated if:

- "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with applicable requirements under section 360j(f)(1) of this title or an applicable condition prescribed by an order under section 360j(f)(2) of this title."

35. FDA-approved Class III devices must be made and controlled in strict compliance with CGMP regulations and PMA conditions, including the stipulations in 21 CFR Part 820—any significant deviation from those specifications constitutes adulteration under 21 U.S.C. § 351.

36. If the subject ICD was produced under nonconforming manufacturing processes (e.g., failing to meet the mandated welding, feedthrough, or insulation standards),

the device is adulterated within the meaning of § 351.

***B. The Decedents ICD***

37. Decedent's Implant: On August 28, 2014, Decedent ERIK LOMIS received the subject Medtronic Evera™ XT DR DDBB1D4 ICD. Standard practice and Medtronic's own performance metrics indicated a typical battery service life exceeding 10 years, with ~36 J shock capacity to protect against ventricular fibrillation.

38. The DDBB1D4 was designed and approved by the FDA to deliver full-energy shocks (~36 J) to terminate life-threatening arrhythmias.

39. The DDBB1D4 was also designed and approved by the FDA to alert doctors and users when its battery begins to reach the end of its normal service life by triggering a "Recommended Replacement Time" ("RRT") status once the battery voltage measures 2.73 V or below on three consecutive daily checks.

40. According to Medtronic's specifications, once RRT is set, the device should remain operational for approximately three more months, but is strongly recommended to be replaced promptly to ensure safe, full-energy therapy delivery.

41. If the DDBB1D4 battery continues to deplete beyond the RRT threshold without replacement, the device enters an "End of Service" ("EOS") state. In EOS, the ICD can no longer reliably provide the high-voltage shocks for which it was approved, thereby compromising the patient's safety and placing them at imminent risk.

42. In and around March 14, 2023 Mr. Lomis went to his regularly scheduled appointment with his cardiologist. An interrogation of the subject ICD revealed ~14 months of battery life. No RRT, EOS, nor other alerts were ever given to the Decedent or Doctors.

43. On March 22, 2023, only eight days after the interrogation showed full battery life left for at least one more year or more, Decedent went into ventricular fibrillation (VF).

44. According to data from the ICD and medical records, the ICD detected VF and

attempted therapy but it failed because it delivered only ~5.2 joules instead of the programmed and FDA approved ~36 J on the first shock—far below the FDA-approved specification. The subsequent shocks produced 0 J instead of the programmed and FDA approved ~36 J.

45. Subsequent review by treating cardiologists confirmed the ICD's malfunction. The subject ICD had material failures, including delamination and cracks in crucial internal components, signifying nonconformance with FDA-mandated specifications.

### *C. Defendant's Specific PMA Violations*

46. Upon inspection by Medtronic personnel of the device after it was explanted from the Decedent's body, the feedthrough assembly and associated components were observed and measured using stereo zoom microscopes, macroscopes, and Optical Coherence Tomography (OCT) instruments, as detailed in Medtronic's analysis reports.

47. The feedthrough assembly of the Decedent's ICD is a critical component that provides an insulated pathway for electrical current between the internal circuitry (connected to the battery and electronic components within the hermetically sealed "can" or body of the ICD) and the external connector cavity where the leads attach. The feedthrough includes conductive pins that pass through insulating structures, including an epoxy material identified by Medtronic as "Dadet," designed to maintain electrical isolation and hermetic integrity. The Dadet itself is also supposed to be hermetically sealed with a type of silicone.

48. The points of electrical connection between the ICD's internal circuitry, the feedthrough pins, the contacts within the connector cavity, and the corresponding contacts on the attachable leads facilitate the delivery of electrical therapy. These components are attached via various "lead connectors" under applicable standard International Organization for Standardization (ISO) 27186:2010.

49. In addition to microscopic visual inspections, Medtronic personnel also performed

functional testing on the explanted ICD, including battery voltage and electrical impedance tests, which failed, revealing out-of-specification results for battery voltage and certain lead impedance measurements.

50. Medtronic personnel performed a download (interrogation) of the device's internally stored data, including historical measurements of battery voltage, lead impedances (pacing and high-voltage), device parameter settings, recorded arrhythmic events, delivered therapies, battery longevity estimates, and diagnostic information.

51. The post-explant analysis and data interrogation confirmed that on the date of the incident, the device detected a ventricular tachyarrhythmia (Episode #46), attempted to charge and deliver the preprogrammed high-voltage shock therapy of 35 joules to the Decedent’s heart, but failed to deliver effective therapy due to a short circuit, resulting in a catastrophic failure of the device's life-sustaining function.

52. The short circuit occurred because the electrical conductors within the feedthrough assembly did not have their required electrical isolation, allowing current to flow through unintended, low-resistance paths to surrounding conductive body fluids or device components, rather than delivering the therapeutic energy through the leads to the heart.

53. The post-explant inspection of the feedthrough system revealed significant defects in the "Dadet" epoxy material, including cracking, webbing, and widespread delamination (separation) between the epoxy and adjacent components (e.g., sapphire insulator, feedthrough shelf). These Dadet defects were measured and found to range from 38.3 µm to 81.2 µm across the feedthroughs. These defects evidence a lack of structural and seal integrity within the feedthrough assembly, originating from the time of manufacture as will be explained below.

54. Prior to the premarket approval application and subsequent approval of this subject device, the FDA recognized ISO 27186:2010 ("Active implantable medical

devices — four-pole connector system for implantable cardiac rhythm management devices — dimensional and test requirements") as a standard applicable to PMA review of this ICD, creating a requirement that Medtronic would adhere to it during the design, premarket approval, and manufacturing processes of the Decedent's subject ICD. The FDA conditioned the approval of the ICD on Medtronic's compliance with ISO 27186:2010.

55. In particular, ISO 27186:2010 mandates "electrical isolation" between conductive components within the connector system (tested according to Annex A of ISO 27186). This requirement applies to the conductors passing through the connector cavity and lead connector interface, ensuring they are isolated from each other and from surrounding conductive fluids. Lack of sufficient electrical isolation creates a high risk of short circuiting. The subject device exhibited an impedance of <20 ohms during the failed shock attempts, which is conclusive proof of a severe failure of electrical isolation.

56. ISO 27186:2010 Clause 4.2.1.4 mandates that the "seal zones" on the surface of the lead connector itself be "pristine," with "no indentation, protrusions, gaps or steps exceeding surface finish allowance," specifying maximum surface roughness (Ra) values (e.g., 0.4 µm or 0.8 µm depending on material hardness).

57. The purpose of the "pristine" requirement for the lead connector seal zones, as articulated by ISO 27186 Clause 4.2.1.4, is to ensure a reliable seal against the sealing rings in the generator cavity, preventing fluid ingress that could compromise electrical isolation or connection integrity. The underlying principle is that sealing components must be free from defects that could enlarge under stress and lead to leakage or failure.

58. The defects (such as cracks, voids, or delamination) in the Decedent's ICD, including in critical sealing and insulating components, like the Dadet epoxy within the feedthrough assembly, can only result from inadequate manufacturing process controls, such as improper material handling, insufficient curing

parameters, contamination, inadequate humidity and/or temperature control, and failure to meet dimensional tolerances during assembly.

59. The primary risk associated with defects compromising the integrity of sealing and insulating components, such as the Dadet epoxy in the feedthrough, is the loss of electrical isolation leading to short circuiting and failure to deliver therapy. If any imperfections, gaps, or cracking exist in the Dadets or insulation, electrical isolation fails and it provides a potential escape route for electrical charge, such that the entire charge or a portion therefore does not go through the lead and into the heart but rather into the surrounding body tissue.

60. During the premarket approval process for the device lineage, a condition of approval was that the device would be manufactured in such a way that it would "maintain functional integrity", including electrical isolation and mechanical performance of the connector system, "throughout the life of the device."

61. During the premarket approval process, Medtronic was required by FDA regulations (including CGMPs, 21 CFR Part 820) and PMA commitments to manufacture sealing and insulating components, such as the feedthrough assembly including the Dadet epoxy, such that they were entirely free from defects, otherwise known as "pristine," that could compromise device integrity and performance over its expected lifetime. This was necessary to ensure that deviations did not propagate under mechanical, electrical, or biological stresses, eventually resulting in a loss of electrical isolation and short circuiting.

62. Upon the post-incident ICD interrogation, the battery data demonstrated excessive battery drain. This resulted from micro-electrical leakage due to compromised electrical isolation, originating from defects present at the time of manufacture and implantation, constituting a failure to meet the electrical isolation requirements mandated by applicable standards (such as ISO 27186 Annex A) from the time of manufacture. This is further proof that the device never achieved the required level of electrical isolation at the time of manufacture.

63. The microscopic level photographs and quantitative measurements (including OCT) from the post-explantation analysis of the subject device's feedthrough assembly document significant imperfections (delamination gaps up to 81.2 µm, cracks, webbing) in the Dadet epoxy. The sheer size, nature, and extent of these imperfections indicate that microscopic defects were present at the time of manufacture and implantation, exceeding the quality standards required by PMA specifications and CGMPs for critical sealing/insulating components designed to last the lifetime of the device.

64. Specifically, the magnitude of the observed defects, such as delamination gaps within the Dadet epoxy exceeding 80 µm, was vastly larger (over 100-200 times) than the stringent surface finish allowances (0.4 µm - 0.8 µm Ra) specified for pristine sealing surfaces on lead connectors under PMA requirement- ISO 27186 Clause 4.2.1.4, illustrating the severity of the manufacturing defects in the feedthrough relative to standards demanding defect-free sealing components.

65. Also, during the premarket approval process, Medtronic was required by the FDA to ensure that manufacturing accomplished hermetic sealing of the Dadets to prevent what Medtronic termed "feedthrough corrosion" by blocking bodily fluid and biochemical ingress into the Dadets and feedthrough assemblies. See Medtronic's Dadet US Patent 7,064,270 B2. The purpose of this hermetic sealing was to ensure the Dadets remained pristine throughout the device's lifespan, thereby maintaining electrical isolation. However, the cracking, webbing, and delamination observed across all nine Dadets upon inspection conclusively evidence that these Dadets were not hermetically sealed at the time of manufacturing as required by the FDA.

66. If the Dadets were hermetically sealed at the time of manufacture as required by the FDA and Medtronic's own patent, the cracking, webbing and delamination to the Dadets would not have occurred. Thus, it is known that the Dadet's were not in fact hermetically sealed at the time of manufacture, which is a violation of the

PMA. It was this cracking, webbing, and delamination of the Dadets that caused the lack of electrical isolation. And it was the lack of electrical isolation that caused the short circuit on the date of the Decedent's death.

67. The premarket approval process required Medtronic to ensure, as a precondition for approval, that the feedthrough assembly, including the Dadet epoxy, would maintain its ability to insulate against short circuiting for the expected service life of the device. This standard was violated because the Dadet epoxy and feedthrough assembly contained manufacturing defects that deteriorated, causing the device to short circuit before the end of its expected life, thereby causing the Decedent's premature death.

68. Furthermore, Medtronic's own actions demonstrate internal acknowledgment of issues with the manufacturing process related to the feedthrough's Dadet epoxy, the very component that failed in the Decedent's device. Records indicate that Medtronic sought and obtained FDA approval for manufacturing changes specifically involving the "dadet used in feedthrough assembly" via at least two PMA Supplements: Supplement S721, approved in November 2019, and Supplement S779, approved in December 2021. Critically, both of these process changes occurred years after the Decedent's device was manufactured (May 2014), but prior to its failure in March 2023.

69. These official PMA Supplements, documenting Medtronic's need to alter its manufacturing process for the Dadet epoxy within the feedthrough, serve as compelling evidence that Medtronic had internally identified deficiencies, inconsistencies, or undesirable outcomes associated with the prior manufacturing process – the process used for the Decedent's device. The necessity for Medtronic to implement and validate these changes strongly supports the contention that the original manufacturing process was defective, failing to consistently produce feedthrough assemblies with the required material integrity and robustness needed to ensure long-term electrical isolation and prevent failures like the one

experienced by the Decedent. This contradicts representations made during the PMA process regarding the device's expected reliability and functional integrity.

70. Defendant's alleged failure to adequately develop, conduct, control, and monitor the production processes with respect to the subject ICD's feedthrough assembly and its Dadets, and confirm that it consistently met its specifications for hermeticity, electrical isolation, and defect-free sealing components throughout its intended service life, constitutes a failure to adhere to applicable federal regulations, including but not limited to 21 CFR § 820.70 (Production and Process Controls); 21 CFR § 820.75 (Process Validation); and 21 CFR § 820.80 (Acceptance Activities).

71. Defendants' conduct violated FDA-imposed requirements for a Class III, PMA-approved ICD by failing to ensure the Evera™ XT DR DDBB1D4 adhered to the performance specifications set forth in its FDA Premarket Approval and required under 21 CFR Part 820.

72. By deviating from these federally imposed specifications, the device became "adulterated" within the meaning of 21 U.S.C. § 351. That statute deems a medical device adulterated if "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation" fail to conform to CGMP or if the device does not adhere to its PMA conditions. The ICD implanted in Decedent showed significant cracks, delamination, and battery failures indicating that these federally mandated standards were neither followed nor enforced.

73. Because Defendants did not comply with the binding requirements of 21 CFR Part 820, including production and process controls, corrective and preventive action, and final acceptance testing, the ICD was shipped in a defective and unsafe condition. Such shortcomings violate both federal regulations and state tort duties that prohibit releasing defective or adulterated devices into the marketplace.

74. There is a clear connection between Defendants' noncompliance and Decedent's

death. If the ICD had been manufactured in accordance with the FDA's detailed prescriptions, it would have delivered the proper electrical shocks to terminate Decedent's ventricular fibrillation. Moreover, strict adherence to CGMP-based acceptance tests or corrective actions would have uncovered any component irregularities before the device ever reached Decedent.

75. Additionally, Defendants' failure to maintain and apply robust corrective and preventive action (CAPA) measures under 21 CFR § 820.100 allowed known or foreseeable manufacturing deviations to persist without effective remediation. These same deviations caused the ICD's battery to register normal status until it ceased functioning.

76. Defendants' obligation to follow the federally approved design and CGMP requirements also coincides with state-law duties mandating that manufacturers prevent adulterated or defectively made devices from harming patients. Because the ICD was adulterated and improperly validated, it inflicted lethal harm upon Decedent at the precise moment its life-saving function was needed.

77. Accordingly, Defendants' violations of 21 U.S.C. § 351; 21 CFR Part 820; and the PMA conditions proximately caused Decedent's death, as those same violations breached Defendants' duty under state tort law to manufacture a safe, compliant ICD. Had Defendants faithfully adhered to these FDA regulations and specifications, Decedent's device would have delivered the full-energy shock necessary to preserve his life.

78. In addition to violating 21 U.S.C. § 351(h) and 21 C.F.R. Part 820, Defendants' failure to conform to current good manufacturing practice also renders the ICD adulterated under California Health & Safety Code § 111260, which provides: "Any drug or device is adulterated if the methods, facilities, or controls used for its manufacture, processing, packing, or holding do not conform to, or are not operated or administered in conformity with current good manufacturing practice to assure that the ... device meets the ... safety ... identity, [and] strength ... it

purports ... to possess."

79. As alleged in detail above, by failing to adhere to the PMA-approved specifications, feedthrough insulation standards, Dadet insulation standards, electric isolation standards, Defendants placed into commerce an "adulterated" device in violation of 21 U.S.C. § 351(h), which likewise breaches California's parallel prohibition on introducing defective medical devices (Cal. Health & Safety Code § 111295). This same conduct—shipping a product that deviates from its FDA-approved manufacturing framework—constitutes a violation of California's longstanding doctrine of strict products liability.

80. Thus, the same conduct that violates federally imposed CGMP requirements violates California's parallel prohibition on manufacturing an adulterated device. This unlawful departure from mandatory standards directly caused the ICD to malfunction, depriving Decedent of the life-saving shock and resulting in his fatal cardiac event

### *D. FDA RECALLS ON THE EVERA™ XT DR DDBB1D4 ICD*

81. Defendants were aware, before Decedent's injury, that certain subsets of their Evera™ XT DR DDBB1D4 ICD's were prone to manufacturing defects affecting the device's ability to deliver lifesaving shocks. Multiple FDA-published recalls confirm that Medtronic identified a "rare potential" for the device to deliver reduced or no energy during high-voltage therapy, often because of nonconforming circuit components or rapid battery depletion.

82. One Class 1 Recall (initiated May 10, 2023) specifically referenced the Evera™ XT DR DDBB1D4 ICD, stating "there is a rare potential for reduced- or no-energy output during high-voltage (HV) therapy." Medtronic's own data in that recall showed a subset of devices could abruptly fail to deliver more than a fraction of the ~36 J required by the FDA. The notification acknowledged that "patient audible alerts and CareAlerts™ may not reliably notify the patient or clinician, due to this issue," risking a situation where the ICD's battery or circuit defects go

unrecognized until a lethal arrhythmia occurs.

83. Another Class 1 recall, beginning February 3, 2021 (for the Evera and Visia ICD families), noted that a specific group of units "may experience shortened recommended replacement time to end of service," causing sudden battery depletion. As a result, many potentially nonconforming ICDs—including the subject device—remained in service, placing patients like Decedent at continuous risk.

84. Although these Class 1 recalls admitted a known hazard, they were written in a manner that did not mandate device removal from patients already implanted.

85. Earlier Class 2 recalls (e.g., initiated August 12, 2016) similarly documented concerns about "rapid battery depletion" due to a "low resistance path developing within the circuit component." Medtronic's recall communication explained that the device might deplete in as few as 7 days after the defect manifests, causing little or no therapy output.

86. Although recalls prior to Mr. Lomis' death were for the same or similar models of ICDs, Mr. Lomis' subject ICD [i.e., his specific serial number] was never recalled prior to his death.

87. The most common way that the battery depletes in these devices is a lack of complete electrical isolation, because it results in incremental escapes of electricity into the surrounding body. The most common cause of a lack of electrical isolation is a failure to adhere to strict manufacturing requirements regarding pristine Dadets and hermetic sealing at the feedthrough.

88. Despite acknowledging this serious hazard, Defendants opted for general field notices, advising physicians to "consider device replacement," without uniformly directing retrieval or removal of all at-risk ICDs.

89. These FDA recalls confirmed that Defendants tracked multiple confirmed failures—some resulting in partial or no shock delivery—and recognized that a notable percentage of remaining in-service devices might experience the same

defect. Nevertheless, Defendants did not implement a comprehensive removal or mandatory replacement directive. Patients relying on these ICDs had no assurance whether they possessed a device from the defective subset until it malfunctioned during a life-threatening arrhythmia.

90. The recalls further show that Defendants had prior knowledge of the risk that the Evera™ XT DR DDBB1D4 ICD might not deliver the FDA-approved energy levels or the proper battery alerts. Instead of ensuring every potentially defective device was removed, Medtronic merely provided optional recommendations and limited monitoring protocols, leaving at-risk ICDs implanted in unsuspecting patients—including Decedent. These omissions exacerbated the danger, because a device that fails to deliver shock therapy or RRT alerts exposes a patient to fatal outcomes if a cardiac arrhythmia strikes unannounced.

## V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## NEGLIGENCE

**(Against All Defendants, Including DOES 1-100)**

91. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

92. Defendants, including DOES 1–100, owed a duty under California law to design, manufacture, test, inspect, label, and warn about the Evera™ XT DR DDBB1D4 ICD so that it complied with FDA Premarket Approval specifications and was safe for its intended use.

93. At all relevant times, Defendants were obligated by the device's PMA approval conditions under 21 C.F.R. Part 820, by recognized standards including ISO 27186:2010 (specifically Annex A and Clause 4.2.1.4), and by their own Dadet U.S. Patent No. 7,064,270 B2 to manufacture the subject ICD's feedthrough assembly—particularly the Dadet epoxy and Dadet's own silicone sealing—in a manner that ensured both hermetic sealing and electrical isolation throughout the

device's lifetime. These legal and regulatory requirements encompassed strict process controls (21 C.F.R. § 820.70), process validation (21 C.F.R. § 820.75), acceptance activities (21 C.F.R. § 820.80), and maintaining "pristine" seal zones to prevent conductive pathways and, or fluid ingress that could undermine safe data transmission and therapy delivery.

94. In direct violation of these mandates, Defendants manufactured and distributed an ICD with defects in the Dadet epoxy feedthrough—namely cracking, webbing, and delamination—which compromised hermetic integrity and did not satisfy ISO 27186:2010's demands for electrical isolation and "pristine" interface surfaces. Because these defects allowed bodily fluids to intrude and the internal circuitry to short, the device was adulterated under 21 U.S.C. § 351 and failed to meet the PMA conditions requiring continuous electrical isolation. By disregarding the patent's requirement to hermetically seal the Dadets and by failing to follow applicable CGMP regulations (21 C.F.R. §§ 820.70, 820.75, 820.80), Defendants placed into commerce a device with a compromised feedthrough assembly.

95. In addition to the PMA-approved specifications, Defendants are required to comply with 21 CFR Part 820—Current Good Manufacturing Practices (CGMPs). These regulations mandate that the manufacturing processes, including production and process controls, process validation, acceptance activities, and corrective and preventive actions, be strictly followed to ensure that every device meets its approved design and is safe for use.

96. Specifically, 21 CFR § 820.70 requires Defendants to develop and control production processes with detailed standard operating procedures and documented instructions so that each ICD conforms to its FDA-approved design. Furthermore, 21 CFR §§ 820.75 and 820.80 require robust validation and final acceptance testing to confirm proper shock-energy output, battery performance, and structural integrity before a device is released for distribution.

97. Defendants breached these duties by failing to adhere to the detailed

manufacturing specifications and CGMP requirements. Rather than ensuring that every ICD was built and tested to deliver a full-energy shock of ~36 J throughout its life time by ensuring complete electrical isolation, Defendants' manufacturing processes were deficient.

98. On March 22, 2023, only eight days after this interrogation, Decedent Erik Lomis experienced ventricular fibrillation. Although the ICD detected the arrhythmia, it delivered only about 5.2 J on its initial shock and subsequent shocks produced 0 J, far below the FDA-approved full-energy output of approximately 36 J.

99. Defendants' failure to properly implement production controls and conduct thorough final acceptance testing allowed these manufacturing deviations to persist. Their inability to identify and remediate these defects through effective corrective and preventive actions directly resulted in the device being released in a defective and unsafe condition.

100. Moreover, Defendants had prior knowledge of similar manufacturing issues with the Evera™ XT DR DDBB1D4 ICD. Multiple FDA recalls issued before Decedent's injury confirmed that a subset of these devices was prone to critical failures—such as reduced or absent shock energy output and rapid battery depletion—due to nonconforming circuit components and inadequate manufacturing processes.

101. Plaintiffs contend that if Defendants had faithfully complied with the FDA-mandated specifications and maintained robust manufacturing controls, the subject ICD would have reliably delivered a full-energy shock to terminate Decedent's ventricular fibrillation. Instead, Defendants' negligence in manufacturing and quality control resulted in the delivery of inadequate shock energy, thereby causing Decedent's death and resulting in substantial damages to Plaintiffs.

102. As a direct and foreseeable result of Defendants' noncompliance, the ICD failed to deliver a life-saving therapeutic shock when the Decedent required it, causing the fatal arrhythmic event. Had Defendants properly adhered to their PMA

obligations, strictly complied with ISO 27186:2010 standards for isolation and pristine electrical flow, and fulfilled the hermetic-sealing provisions of their own Dadet patent, the feedthrough assembly would have provided the necessary electrical isolation over the device's lifespan, and the Decedent would have received the intended life-sustaining therapy.

103. If the subject Device was manufactured according to the PMA specifications, the Device would have appropriately delivered energy to the Decedent's heart and he would have survived.

104. Defendant's negligent manufacturing described above was a substantial factor in causing Plaintiffs' harm.

105. Plaintiffs therefore seek all compensatory and general damages, as allowed by law, for the harm and losses caused by Defendants' defective product. Plaintiffs also request costs, interest, and any further relief the Court deems just and proper, ensuring accountability for a product that fatally deviated from its federally approved design.

## SECOND CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

## (Against All Defendants, Including DOES 1-100)

106. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.

107. Reporting is mandated by 21 C.F.R. § 803.50, which requires manufacturers to alert the FDA of incidents in which the device may have contributed to serious injury or death, or of recurring malfunctions likely to cause harm.

108. Under California law, this duty to warn encompasses the obligation—parallel to federal regulations—to inform the FDA when post-sale data and adverse events suggest a device may be failing or posing a substantial risk to patients.

109. On the following dates, Medtronic made submissions to the Food and Drug Administration ("FDA") via the MAUDE database, reporting that the Evera™ XT

DR ICD (DDBB1D4) exhibited an electrical connectivity issue and performance anomalies related to the battery, resulting in either a lower-than-programmed shock, a complete failure to deliver a shock when activated by the patient and the device, or a shortened battery life: 1/25/2017, 4/19/2021, 4/19/2021, 5/12/2017, 7/12/2017, 4/19/2021, 4/19/2021, 4/10/2018, 4/19/2021, 4/19/2021, 4/19/2021, 4/10/2018, 4/19/2021, 4/19/2021, 4/19/2021, 10/04/2018, 4/19/2021, 12/12/2022, 4/19/2021, 10/11/2018, 1/8/2019, 4/19/2021, 4/19/2021, 4/19/2021, 4/16/2019, 6/4/2019, 6/30/2019, 6/6/2019, 6/7/2019, 4/19/2021, 7/22/2019, 4/19/2021, 4/19/2021, 4/19/2021, 4/19/2021, 11/03/2020, 4/19/2021, 4/19/2021, 11/12/2019, 12/23/2019, 2/05/2020, 2/05/2020, 2/14/2020, 2/11/2020, 4/19/2021, 3/18/2020, 4/19/2021, 4/19/2021, 7/1/2020, 4/19/2021, 4/19/2021, 7/28/2020, 8/3/2020, 8/05/2020, 4/19/2021, 9/9/2020, 9/25/2020, 4/19/2021, 11/23/2020, 12/07/2020, 4/21/2021, 5/12/2021, 2/18/2021, 6/14/2022, 4/1/2021, 6/21/2021, 4/5/2021, 6/3/2021, 6/21/2021, 5/5/2021, 6/10/2021, 2/1/2022, 6/23/2021, 6/30/2021, 7/2/2021, 8/3/2021, 8/11/2021, 8/30/2021, 8/24/2021, 9/20/2021, 10/27/2021, 10/26/2021, 11/12/2021, 11/8/2021, 12/14/2021, 10/22/2021, 10/22/2021, 12/14/2021, 1/24/2022, 1/24/2022, 11/18/2021, 8/31/2022, 12/16/2021, 12/21/2021, 1/12/2022, 1/24/2022, 3/17/2022, 4/4/2022, 1/12/2022, 2/21/2022, 3/30/2022, 4/20/2022

110. In each of these reports submitted to the FDA, Medtronic omitted any reference to the known manufacturing defect involving the Dadet and its lack of hermetic sealing, which was causing short-circuiting and catastrophic failures.

111. It is Plaintiffs' allegation that the majority of these MAUDE complaints are the result of a manufacturing defected associated with Dadets described above, which in turn causes a lack of electrical isolation.

112. Medtronic's own conduct reflects an internal acknowledgment of manufacturing problems associated with the Dadet epoxy used in the feedthrough—the very component that ultimately failed in the Decedent's device.

Records indicate that Medtronic obtained FDA approval for changes relating specifically to the Dadet epoxy in the feedthrough assembly through at least two PMA Supplements: Supplement S721, approved in November 2019, and Supplement S779, approved in December 2021.

113. Both of these modifications received approval after the Decedent's device was manufactured in May 2014, but prior to its failure in March 2023.

114. These official PMA Supplements detail Medtronic's need to revise its manufacturing processes for the Dadet epoxy inside the feedthrough, thereby demonstrating that Medtronic had internally identified deficiencies, irregularities, or unfavorable results linked to its original manufacturing method—the same method used for the Decedent's device.

115. Defendant knew or should have known that the original manufacturing approach was flawed, as it did not consistently produce feedthrough assemblies with the required material integrity and robustness to ensure long-term electrical isolation and prevent failures of the kind suffered by the Decedent.

116. However, Defendant failed to inform and warn the FDA that the reason there were failures of the Evera™ XT DR DDBB1D4 ICD was the Dadet manufacturing failure, and instead offered vague, imprecise descriptions on each date described above without describing the known cause. Such omissions directly impacted the ability of the Decedent's physicians to decide whether to replace or more closely evaluate his ICD in time.

117. By failing to inform the FDA of the likelihood that the malfunction would recur, Defendants violated their duty under 21 C.F.R. § 803.50.

118. Had the FDA been fully apprised of the extent and severity of the Dadet manufacturing failures, the Decedent's ICD would have been flagged for urgent removal or replacement, and the Decedent would not have relied on the device. Consequently, the failure to warn the FDA prevented the dissemination of accurate risk data to medical providers, thwarting the possibility of timely corrective action.

119. Defendants' conduct in withholding or minimizing adverse event information directly contravened federal reporting regulations and violated the parallel state-law duty to convey adequate warnings. This breach of duty led to the Decedent's ICD malfunctioning with no prior indication, resulting in his untimely death and devastating losses to Plaintiffs.

120. This failure to warn the FDA was a substantial factor in causing the Decedent's death. Because no comprehensive recall or mandatory removal was enforced, the Decedent's ICD remained implanted until it catastrophically failed during a ventricular fibrillation event.

121. Plaintiffs allege that had Defendants fully complied with their duty, Mr. Lomis' specific device [i.e., his specific serial number] would have been recalled, removed from his body, and replaced with a working ICD, prior to his death, thereby preventing his death.

122. Accordingly, Defendants are strictly liable for their failure to warn under California law. Plaintiffs seek all compensatory and general damages permitted by law, in an amount to be established at trial, including but not limited to, funeral costs, and noneconomic damages for the profound harm caused by the Decedent's death.

123. Had Defendants fully complied with the required post-market FDA notification processes, including accurate, complete adverse event reporting, robust warnings would have been issued and the Decedent's physicians would have acted to prevent his fatal outcome by removing and replacing his device before his death. Decedent himself also would have acted to remove and replace his device prior to his death.

124. As a direct consequence of Defendants' failure to report these known adverse events to the FDA, the Decedent and the Decedent's physicians were never adequately warned of the ICD's propensity to deliver insufficient shock energy and thus did not remove or replace it in time to prevent the Decedent's fatal arrhythmia event.

125. Plaintiffs therefore seek all compensatory and general damages, as allowed by law, for the harm and losses caused by Defendants' defective product. Plaintiffs also request costs, interest, and any further relief the Court deems just and proper, ensuring accountability for a product that fatally deviated from its federally approved design.

**THIRD CAUSE OF ACTION**

**STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT**

**(Against All Defendants, Including DOES 1-100)**

126. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.

127. Defendants designed, manufactured, and distributed the Evera™ XT DR DDBB1D4 ICD under a Class III Premarket Approval (PMA) from the FDA, thereby agreeing to comply with the device's approved manufacturing specifications and the Current Good Manufacturing Practices (CGMPs) set forth in 21 CFR Part 820.

128. A strict manufacturing defect arises when a product unit departs from the intended design or from other identical units in the same product line, causing it to be unreasonably dangerous. In this instance, the ICD deviated from both its FDA-approved specifications and Defendants' own manufacturing standards, rendering it adulterated under 21 U.S.C. § 351(h).

129. At all relevant times, Defendants were responsible for placing into the stream of commerce an ICD that was supposed to meet its FDA premarket approval requirements (21 C.F.R. Part 820), the specifications in ISO 27186:2010 (including Annex A and Clause 4.2.1.4), and the hermetic-sealing requirements of Defendants' own Dadet Patent No. 7,064,270 B2. These standards demanded that the Dadet epoxy feedthrough assembly remain hermetically sealed, maintain electrical isolation, and preserve pristine conditions for data flow throughout the device's operational life.

130. Contrary to those obligations, Defendants manufactured an ICD with compromised Dadet epoxy—exhibiting cracking, webbing, and delamination—so severe that fluid ingress and short circuits were virtually inevitable. This substandard construction violated the device's federally mandated PMA conditions and adulterated the ICD within the meaning of 21 U.S.C. § 351, as it failed to conform to the current good manufacturing practices that required a pristine, defect-free seal capable of withstanding biological and electrical stresses over the product's intended lifespan.

131. Because the ICD deviated from the FDA-mandated manufacturing processes, it failed to adhere to the "validated" production methods set forth in 21 CFR § 820.75. Defendants either failed to discover or ignored the defects during acceptance testing, further violating 21 CFR § 820.80, which mandates thorough inspections and documentation before releasing the device for distribution.

132. By shipping an adulterated device that was never identified or corrected through the required Corrective and Preventive Action (CAPA) measures in 21 CFR § 820.100, Defendants placed a dangerously defective ICD into the hands of Decedent and his physicians, unaware that a critical internal defect existed.

133. The device's nonconforming components directly caused it to fail at the pivotal moment of Decedent's ventricular fibrillation episode. Rather than delivering a life-saving shock consistent with the FDA-approved design, the ICD discharged only 5.2 J initially and then 0 J upon subsequent attempts. Under strict liability principles, Defendants are accountable for placing this defective unit into the stream of commerce.

134. The ICD's variance from its intended output was not a minor fault but a substantial departure that nullified its essential function—terminating arrhythmias. This deviation was inherent in the product itself when it left Defendants' control, fulfilling the hallmark of a manufacturing defect under

California law.

135. Because the device was delivered to end-users in this flawed and unsafe state, it proved incapable of providing the necessary shock therapy when the Decedent experienced a life-threatening arrhythmia. Had Defendants adhered to ISO 27186:2010's electrical isolation requirements, properly hermetically sealed the Dadets in line with their own patent, and maintained PMA-level quality controls, the ICD would not have malfunctioned and would have performed its life-sustaining function as intended—the ICD would have provided the high-voltage therapy essential to saving Decedent's life. This causal nexus demonstrates that the product defect directly led to Decedent's fatal outcome.

136. As a foreseeable, direct, and proximate result of this manufacturing defect, Decedent suffered a fatal arrhythmia that the ICD should have averted. Plaintiffs have incurred significant losses, including emotional anguish, loss of companionship, and economic damages attributable to Decedent's premature death.

137. Defendant's defective manufacturing of the Decedent's ICD was a substantial factor in causing Plaintiff's harm.

138. Plaintiffs therefore seek all compensatory and general damages, as allowed by law, for the harm and losses caused by Defendants' defective product. Plaintiffs also request costs, interest, and any further relief the Court deems just and proper, ensuring accountability for a product that fatally deviated from its federally approved design.

## <u>FOURTH CAUSE OF ACTION</u>

## WRONGFUL DEATH

## (Against All Defendants, Including DOES 1-100)

139. Plaintiffs incorporate by reference all previous paragraphs as if fully set forth herein.

140. Plaintiffs are Decedent's heirs and bring a wrongful death action under

California law. Defendants' conduct caused Decedent's death, resulting in the loss of love, companionship, comfort, care, protection, affection, moral support, training, guidance, financial support, gifts, benefits, and household support that Decedent provided to Plaintiffs.

141. Plaintiffs seek all wrongful death damages allowed by law, including economic such as funeral and burial expenses, and non-economic damages.

142. Plaintiffs therefore seek all compensatory and general damages, as allowed by law, for the harm and losses caused by Defendants' defective product. Plaintiffs also request costs, interest, and any further relief the Court deems just and proper, ensuring accountability for a product that fatally deviated from its federally approved design.

## FIFTH CAUSE OF ACTION

## LOSS OF CONSORTIUM

## (Against All Defendants, Including DOES 1-100)

143. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

144. As Decedent's spouse Plaintiff Patricia Laucella lost the benefits of his love, companionship, comfort, care, assistance, protection, affection, society, moral support, and enjoyment of sexual relations due to Defendants' wrongful acts that caused his death.

145. Plaintiff Patricia Laucella seek damages according to proof for loss of consortium.

146. Plaintiffs therefore seek all compensatory and general damages, as allowed by law, for the harm and losses caused by Defendants' defective product. Plaintiffs also request costs, interest, and any further relief the Court deems just and proper, ensuring accountability for a product that fatally deviated from its federally approved design.

///

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. For general and special damages according to proof;
2. For wrongful death and survival damages as permitted by law;
3. For economic and non-economic damages, including loss of consortium;
4. For costs of suit and prejudgment interest as allowed by law; and
5. For such other and further relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

Dated: April 11, 2025

**THE VARTAZARIAN LAW FIRM**

By: ______________________________

Steve Vartazarian, Esq.
Matthew J. Whibley, Esq.
**Attorneys for Plaintiffs,**
PATRICIA LAUCELLA,
LOMIS; NATALIA JOVOVICH;
and NICOLE ROSE LOMIS

**CERTIFICATE OF SERVICE:**

I certify that on the 11th day of April 2025, I electronically transmitted the foregoing SECOND AMENDED COMPLAINT FOR DAMAGES to the Clerk of the Court for the United States District Court Central District of California, by using the CM/ECF system for filing. Transmittal of a true and correct copy of the foregoing document was served electronically or by another manner as authorized by Fed. R. Civ. P. 5.

Dated: April 11, 2025 Matthew Whibley, Esq.

**DECLARATION OF MATTHEW J. WHIBLEY**

I, Matthew J. Whibley, declare as follows:

1. I am a partner at the Vartazarian law firm and counsel of record for the plaintiffs in the above-captioned matter.
2. In compliance with the local rules of this Court, I disclose that I utilized the assistance of ChatGPT O-1 Pro-Mode in the preparation of the attached pleading. Specifically, I drafted the initial complaint and then employed the AI tool to assist with grammar, clarity, and readability enhancements.
3. I hereby certify that I have thoroughly reviewed all source material and that the content generated with the assistance of ChatGPT has been carefully examined.
4. I further certify that the final version of this pleading is accurate and fully complies with my obligations under Rule 11.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed in Calabasas, California.

Dated: April 11, 2025

Matthew Whibley, Esq

## CERTIFICATION OF MEET AND CONFER

I certify that the parties met in person and by videoconference, thoroughly discussed each and every issue preceding the filing of this Second Amended Complaint, and attempted in good faith to narrow the issues before the Court. The conference of counsel took place on April 4, 2025 in person and April 7, 2025 via zoom videoconference.

Dated: April 11, 2025

Matthew Whibley, Esq